FILED
DISTRICT CLERK OF
JEFFERSON CO TEXAS
3/17/2021 8:58 AM
JAMIE SMITH
DISTRICT CLERK
E-207211

Cause No. E-207211

| | | |
|---|---|---|
| DEVON BOUDREAUX; RICHARD BELSEY; SHARON CLUBB; JANET DANCER; PORTER MAY; CINDY PEREZ; CECILE JIMENEZ; SCOTT HAMRIC; BRUCE & TINA HINDS; WILLIAM OLIVIER; ESTEBAN LOPEZ; BILLY STANLEY; CANDACE ABSHIER; SEAN FILLYAW; AUTUMN MINTON; BRANDON SANDERS; RODNEY BADON; CHARLIE CARTER; MYRA WELLONS; JERRY STEPAN; BRYAN MILLS; AND CAT 5 RESOURCES LLC; | § § § § § § § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, individually and on behalf of all those similarly situated, | § § § § | JEFFERSON COUNTY, TEXAS |
| v. | § § § | 172nd JUDICIAL DISTRICT |
| THE STATE OF TEXAS, | § § | |
| Defendant. | § | |

## PLAINTIFFS' SECOND AMENDED PETITION AND REQUEST FOR DISCLOSURES

Individual Plaintiffs Devon Boudreaux; Richard Belsey; Sharon Clubb; Janet Dancer; Porter May; Cindy Perez; Cecile Jimenez; Scott Hamric; Bruce & Tina Hinds; William Olivier; Esteban Lopez; Billy Stanley; Candace Abshier; Sean Fillyaw; Autumn Minton; Brandon Sanders; Rodney Badon; Charlie Carter; Myra Wellons; Jerry Stepan; Bryan Mills; and Cat 5 Resources LLC, who appear individually and on behalf of all persons similarly situated (collectively, "Class Plaintiffs"), respectfully submit this Second Amended Petition seeking declaratory and injunctive relief, as well as just compensation, under both the Texas Constitution and the United States Constitution regarding the taking, damaging, and destruction of private property caused by the design, construction, operation, and maintenance of Interstate Highway 10 by Defendant, the State of Texas.

### NEED FOR ACTION

1.      The State of Texas (the "State"), acting through the Texas Department of Transportation ("TxDOT"), designed, constructed, operates, and maintains Interstate Highway 10

("IH-10"), a major east-west transportation corridor running through Houston and the southern portion of the country.

2.     The State's recent construction of projects in Chambers and Jefferson counties is designed to raise the elevation of IH-10, to widen IH-10 from four to six lanes, and to install a solid concrete traffic median barrier down its centerline to enhance public safety and facilitate use of its eastbound (southside) lanes as an evacuation route during periods of flooding by confining the overtopping of water to the westbound lanes (northside).

3.     The State's installation of an impenetrable bulwark down the center of the elevated IH-10 effectively created a weir,[1] obstructing the natural north/south flow of rainfall runoff. As a result, and consistent with the projects' design and the State's intent, the State flooded Class Plaintiffs' real and personal property. At no point did the State compensate Class Plaintiffs, or their predecessors-in-interest, for any right to flood their private property. The actions by TxDOT to enhance public safety and the capacity of IH-10, and to provide an evacuation route via its eastbound lanes, retained stormwater runoff that flooded Class Plaintiffs' properties which lie north of IH-10 at elevations below the top of this newly constructed dam, thereby taking, damaging, and destroying Class Plaintiffs' real and personal property.

4.     Plaintiffs seek a determination of the State's liability on a class-wide basis to all persons from whom property has been unconstitutionally taken without compensation. Article I, Section 17 of the Texas Constitution guarantees that "[n]o person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made . . . ." Likewise, the

---

[1] A weir is defined as "A dam placed across a river or canal to raise or divert the water … or to regulate or measure the flow." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE at 2025 (3d ed. 1992). Here, the term is used in its "more general definition in engineering to apply to any hydraulic control structure that allows water to flow over its top, often called its crest." *What is a Weir*, PRACTICAL ENGINEERING, https://practical.engineering/blog/2019/3/9/what-is-a-weir.

Takings Clause of the Fifth Amendment to the U.S. Constitution (made applicable to the States through the Fourteenth Amendment) provides "nor shall private property be taken for public use, without just compensation." The virtually unconstrained power of the government to take a citizen's private property without their consent is balanced only by the constitutional guarantee that the government must compensate the owner for taking their property.

5.      The State of Texas had the authority to perform its work on IH-10. And that work was for a public purpose: providing transportation for its citizens and others from across this country. Neither of those propositions can be honestly denied.

6.      Through the recent IH-10 projects, however, TxDOT knowingly and intentionally caused the flooding of each Class Plaintiffs' property. Constitutional protections, both at the state and federal level, mandate that Class Plaintiffs should not be forced to bear those burdens which, in all fairness and justice, should be borne by the public as a whole.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over Class Plaintiffs' claims under Tex. Prop. Code § 21.001. Venue is proper in this Court pursuant to Tex. Civ. Prac. & Rem. Code § 15.011.

## DISCOVERY LEVEL

8.      Individual Plaintiffs, on their behalf and on behalf of Class Plaintiffs, request this cause be governed by Texas Rule of Civil Procedure 190.4 and will seek entry of a Level 3 scheduling order for the action.

## REQUEST FOR DISCLOSURES

9.      Individual Plaintiffs, on their behalf and on behalf of Class Plaintiffs, request Defendant the State of Texas disclose the information as substantively and procedurally required by Tex. R. Civ. P. 194.

## PARTIES

10.     The following are Individual Plaintiffs in this action: Devon Boudreaux; Richard Belsey; Sharon Clubb; Janet Dancer; Porter May; Cindy Perez; Cecile Jimenez; Scott Hamric; Bruce & Tina Hinds; William Olivier; Esteban Lopez; Billy Stanley; Candace Abshier; Sean Fillyaw; Autumn Minton; Brandon Sanders; Rodney Badon; Charlie Carter; Myra Wellons; Jerry Stepan; Bryan Mills; and Cat 5 Resources LLC. Each of the Individual Plaintiffs, like each of the Class Plaintiffs, owns and/or leases real and personal property located in a roughly triangular area of Jefferson County, Texas delineated on the north by Hwy 90, on the west by the Jefferson County line, and on the east and south by IH-10 (hereafter the "Operative Geographic Area"), as depicted below.



11.     Each of the Individual Plaintiffs, like each of the Class Plaintiffs, owned or leased their property at the time they suffered devastating flooding during the last two Tropical Storms - Harvey (August 2017) and Imelda (September 2019) that was inundated, taken, destroyed, and/or damaged by the State of Texas by its design, construction, operation, and/or maintenance of IH-10.

12.     Defendant, the State of Texas, is a sovereign entity and body politic with the power of eminent domain and the constitutional obligation to pay just compensation for the taking, damaging,

and/or destruction of private property for public use. Defendant, the State of Texas answers for its agencies, including but not limited to TxDOT.

## FACTS COMMON TO ALL CLAIMS

13.    The State has known that the work it undertook on IH-10, including installation of a solid concrete traffic median barrier/dam it erected down the middle of IH-10, would block the overtopping of rainfall runoff trying to cross over the roadway as it moved south to the Gulf of Mexico. Indeed, it was told as much before it designed and constructed the highway improvements. Not only did the State ignore the drainage and flooding concerns of local residents, it purposefully altered the drainage plans prepared by its contractors and agents to decrease the drainage under the highway in favor of retaining and storing the water north of IH-10, knowingly and intentionally choosing to inundate those properties to protect properties south of IH-10 from flooding.

14.    The State's design, construction, maintenance, and operation of the highway and its median barrier has caused the flooding of and significant damage to Class Plaintiffs' real and personal property. Even so, the State continued to erect the impermeable traffic barrier/dam, extending it further east down the center of the highway despite knowing of the damage caused to Class Plaintiffs' properties by the rainfall runoff it blocks. The State (a) knew that its actions would cause or were causing damage to Class Plaintiffs' properties; (b) knew that the damage to Class Plaintiffs' properties was substantially certain to result from its actions; (c) knew that the damage to Class Plaintiffs' properties was necessarily an incident to, or necessarily a consequential result of, its actions; and/or (d) knew or should have known that the inundation of Class Plaintiffs' properties was the natural, probable, and foreseeable consequence of its acts.

15.    In 1956, President Dwight D. Eisenhower signed the Federal-Aid Highway Act into law, allocating billions of dollars for the construction of the Interstate Highway System (the "Highway System"), which, in present day, includes IH-10. The Federal Highway Administration dispenses funds

to state governments. In turn, state governments build and maintain the Highway System within their respective boundaries. The states must follow federal regulations that govern the building and maintenance of the Highway System—including any impact of a particular project's design and operation on the hydrology (rainfall runoff characteristics) of the surrounding property.

16.    As various plan sets show, during the design and construction of Federal Aid Projects, TxDOT significantly raised the elevation of IH-10 and installed a new precast concrete barrier in the median between the east/west lanes of IH-10. The barrier was installed in grouted sections so as to form a complete seal and rising multiple feet above the now-elevated grade level of the highway.



17.     The miles of median barrier of IH-10 do not have slots at the base that would otherwise allow water to pass between the north and south sides. Instead, the median barrier is completely solid.



18.     The functional effect of installing the solid median barrier on an elevated IH-10 is to create a weir that blocks stormwater runoff on the north side of the highway centerline. The weir backs up and stores water at or below the elevation of the top of the barrier on private property within the Operative Geographic Area.

19.     The State's design, construction, and maintenance of these barriers/dams was no mistake. Rather, the State has admitted that the barriers/dams—in addition to maintaining traffic safety—are part of its flood control efforts and keep the southern portion (eastbound lanes) of IH-10 open during severe rainfall events that would otherwise overtop the roadway and inhibit traffic from using this roadway.

20.     While the public generally benefits from the access to transportation along at least a portion of this roadway during such rainfall events, the burden of that benefit falls on Class Plaintiffs

within the Operative Geographic Area, each of which are forced to store the retained waters on their property without their permission.

21.     For example, in August 2017, Tropical Storm Harvey brought its rainfall to much of southeast Texas, including Jefferson, Chambers, and Liberty counties. During and after Harvey, the IH-10 median barrier functioned as a leak-proof dam, blocking rainfall runoff from overtopping the entire roadway and proceeding south in its ordinary course. Instead, the IH-10 median barrier backed water up on the north side.

22.     While performing its public functions of providing a safety barrier separating the traffic flow, keeping the eastbound traffic lanes open, and retaining stormwater runoff to protect the property south of the highway, the storm water runoff detained by the IH-10 median barrier backed up onto and flooded Class Plaintiffs' private property, causing significant damage to Class Plaintiffs' properties and severe loss of property rights.



23.    Likewise, in September 2019, TxDOT's median barrier/dam along IH-10 blocked rainfall runoff from overtopping the roadway during and after Tropical Storm Imelda. Again, eastbound traffic lanes remained open and conferred a benefit to the public at large. And, again, the blocked storm runoff water backed up and flooded Class Plaintiffs' property, causing significant damage and severe loss of property rights.



24.    The damage and destruction of Class Plaintiffs' real and personal property was the intended, direct, natural, and/or foreseeable result of State-authorized affirmative action done for a public purpose—namely, the design, construction, operation, and maintenance of IH-10 and the protection of property south of the highway from flooding.

25.    Nor were Harvey or Imelda "rare" or "unprecedented" rain events for this region of southeast Texas. The history of hurricanes, tropical storms, and other large frontal storms that have released significant amounts of rainfall in the area is well documented. The permanent placement of an impenetrable traffic median barrier/dam down the center of IH-10 guarantees that the flooding of Class Plaintiffs' properties will inevitably reoccur, as when Imelda followed Harvey only two years

later. Detained water from storms less severe than Harvey and Imelda will be held on Class Plaintiffs' property because of the State's design, construction, and maintenance of the median barrier/dam down the center of IH-10.

26.     Each Class Plaintiff owned homes, fixtures, businesses, and/or personal property protected from the taking, damaging, or destruction by the State without compensation. The flooding suffered by each Class Plaintiff interfered with the ability to use their land and personal property for their intended purposes. Class Plaintiffs had reasonable expectations that they would be able to occupy and use their homes, businesses, and personal property for the purposes and in the manner for which they were purchased or leased. But the backwater stored onto each Class Plaintiff's property severely interfered with their reasonable investment-backed expectations regarding the occupancy and use of their property. Many Class Plaintiffs were displaced from their homes and had to stay in hotels or alternative accommodations following Harvey and Imelda due to this government-induced flooding.

27.     Portions of Class Plaintiffs' homes, businesses, and/or other improvements have been damaged and/or destroyed, necessitating remedial measures such as tearing out of soiled walls, removing mold-prone insulation, replacing ruined floors, replacing garage doors and other exterior features, and requiring the repair of a vast array of structural components. Moreover, many Class Plaintiffs' properties suffered significant erosion and loss of crops, grasses, and groundcover essential to the use to which Class Plaintiffs had put the properties. And those Class Plaintiffs using their property for commercial purposes were deprived of the use of, and temporarily any access to, their property, losing the benefits and profits attendant to the continued operation of their commercial ventures. Each and every one of these impacts were not only severe but also reasonably foreseeable to the State because of the design, construction, and maintenance of IH-10's median barrier.

28.     The impoundment of rainwater runoff on Class Plaintiffs' property for days on end, destroying Class Plaintiffs' real and personal property and denying them access to that property, is not

something Class Plaintiffs expected or reasonably could have expected when purchasing and developing their property. Many of these tracts have been owned by Class Plaintiffs' forebearers and family members for decades. And, before the State's design, construction, and maintenance of the IH-10 median barrier, Class Plaintiffs' properties had never been subject to flooding of the nature, character, extent, and duration as they experienced after TxDOT built the barriers/dams along the elevated IH-10.

29.    And Class Plaintiffs' problems are not all in the past. Neither Harvey nor Imelda was a "one off" or "unique" flood event for what these Plaintiffs fact since the State's erection of the barrier, and they will not be the last flooding Plaintiffs experience because of the State's actions. The flooding of Class Plaintiffs' properties is the product of the State's design, construction, and maintenance of its projects. And during foreseeable and anticipated storm events (even those of a lesser magnitude of Harvey and Imelda), IH-10 will capture and store rainfall runoff onto Class Plaintiffs' properties.

30.    Class Plaintiffs suffered the permanent damage and destruction of real property due to the flooding, which necessitated repairs such as tearing out soiled walls, removing mold-prone insulation, replacing ruined floors, replacing garage doors and other exterior features, and requiring the repair of other structural issues.

31.    In addition to the physical damage to real property, Class Plaintiffs' real property values, including the market value of homes, businesses, and/or other improvements, have suffered diminution in value.

32.    And Class Plaintiffs suffered the permanent damage, destruction, and tragic loss of personal property including appliances, furniture, tools, machinery, livestock, crops, vehicles, air conditioning units, and similar personal property in addition to the tragic loss of personal effects and mementoes which can never be replaced.

**PLAINTIFFS' SECOND AMENDED PETITION AND REQUEST FOR DISCLOSURES        PAGE 11**

33.     Those Class Plaintiffs using the property for commercial purposes have been deprived of a temporary but total loss of access to, as well as the benefits and profits attendant to the continued operation of, their commercial ventures, all as a direct, natural, or probable consequence of these State projects. Class Plaintiffs seek full compensation to which they are entitled.

34.     The State does not own any right to store rainfall runoff on Class Plaintiffs' private property. The State has never made an offer to Class Plaintiffs to purchase an easement or other property interest for the storage of floodwaters. The State has never attempted to use its power of eminent domain to acquire an easement or other property interest from Class Plaintiffs for the purpose of storing rainfall runoff. The State has never compensated or offered to compensate Class Plaintiffs to use their property to store water.

35.     The following summarizes the foundation of claims presented by Individual Plaintiffs on their own behalf as well as on behalf of Class Plaintiffs, which are similarly situated:

a.   each of the Individual Plaintiffs owned and/or leased real and personal property located north of IH-10 in Jefferson County, Texas;

b.   each of the Individual Plaintiffs owned and/or leased the above-referenced property at the time the property suffered devastating flooding during Tropical Storms Harvey (August 2017) and Imelda (September 2019);

c.   each of the Individual Plaintiffs' real and personal property was inundated, destroyed, and/or damaged as a result of the affirmative actions of the State in designing, constructing, operating, and/or maintaining the configuration of IH-10;

d.   each of the Individual Plaintiffs' property was damaged by State actions which either (a) the State knew would result from its actions, (b) the State knew were substantially certain to result from its actions, and/or (c) were the natural, probable, and/or foreseeable consequence of the State's affirmative acts; and

e. each of the Individual Plaintiff, as a consequence of the foregoing, is entitled to recovery of just compensation for the losses suffered by the taking, damaging, and/or destruction of their real and personal property.

## CLASS ALLEGATIONS

36.    In addition to asserting claims on their own behalf, Individual Plaintiffs bring this action as a class action. Individual Plaintiffs seek to represent the following Class:

> Persons (whether individuals, businesses, or others) that leased and/or owned real and/or personal property which was located within the Operative Geographic Area and flooded during Tropical Storms Harvey and/or Imelda. Excluded from the Class are the State and Federal Governments, and the Court and Court personnel.

37.    The elements of Rule 42(a) are met with regard to the Individual Plaintiffs, the Class, and the Class Plaintiffs in that: the Class is so large that joinder of all members is impracticable; there are questions of law or fact common to the Class; the claims or defenses of Individual Plaintiffs are typical of the claims or defenses of the Class; and Individual Plaintiffs will fairly and adequately protect the interests of the Class.

a.    The Class is so numerous that joinder is impracticable. The Class comprises hundreds of properties located in Jefferson County.

b.    Questions of law and/or fact common to the Class exist to support certification. The liability claims of Class members depend on common legal and factual contentions that are capable of class-wide resolution. Legally, liability is uniform across the class: whether the State's actions which impounded stormwater on the Class' private property during Harvey and/or Imelda violated the Texas Constitution and/or the U.S. Constitution. That determination of liability turns on common facts: the actions of the State in designing, constructing, and maintaining Interstate Highway 10 (including raising the highway profiles and installing the concrete barrier) with the known, direct, natural, and/or probable consequence of the State's projects being the flooding of the Class Members' property.

c.    Additionally, the questions of law and fact common to the Class, particularly as pertains to liability, predominate over any questions affecting individual members of the Class. The common legal and factual questions, which do not vary among members of the Class and which may be determined without reference to the individual circumstances of any Class member, include:

i.    Whether the State's action caused the flooding of Plaintiffs' properties;

ii.    Whether the State's action was done for a public purpose as required to recover for a taking under the Texas and/or U.S. Constitutions;

iii.    Whether the State's action was done with the requisite intent required to recover for a taking under the Texas and/or U.S. Constitutions;

iv.    Whether the intent required to recover for a taking under the Texas and/or U.S. Constitutions is (or should be) the same;

v.    Whether the inundation, destruction, damage, and/or devaluation of Class Plaintiffs' real and/or personal property caused by the State's actions constitutes an unconstitutional taking of Class Plaintiffs' property without just compensation under the Texas and/or U.S. Constitutions;

vi.    Whether the inundation, destruction, damage, and/or devaluation of Class Plaintiffs' real and/or personal property was the intentional, natural, probable, and/or reasonably foreseeable consequence of the State's actions; and

vii.    Whether the inundation of Class Plaintiffs' real and/or personal property resulted in a sufficiently severe interference with their property rights as to constitute a taking under the Fifth Amendment of the U.S. Constitution.

d.    Individual Plaintiffs' claims are typical of the claims of Class Plaintiffs' claims. Individual Plaintiffs and Class Plaintiffs were inundated by water intentionally stored by the

State on and over their real and personal property in August/September 2017 and September 2019 in the same manner, by the same mechanism, and under the same set of facts. The relief Individual Plaintiffs seek is typical of the relief required and requested by Class Plaintiffs. And the issues to be joined at trial, both factually and legally, for Individual Plaintiffs are the same as those that would be joined for Class Plaintiffs.

   e. Individual Plaintiffs, as representatives of the Class, will fairly and adequately protect the interests of the Class and Class Plaintiffs. Individual Plaintiffs' interests are consistent with, and not antagonistic to, those of the Class they seek to represent and Class Plaintiffs. Individual Plaintiffs and Class Plaintiffs all seek just compensation under the Texas Constitution and the U.S. Constitution.  Individual Plaintiffs have no interests that are adverse to, or which conflict with, the interests of members of the Putative Class and are ready and able to fairly and adequately protect the interests of the Putative Class. Plaintiffs strongly believe the State must provide just compensation for taking private property which flooded during Harvey and Imelda which was caused by the State's actions. Plaintiffs are represented by experienced, qualified, and competent counsel who are committed to prosecuting this action. Counsel is knowledgeable about, and experienced in, conducting class action litigation, complex multi-plaintiff litigation, takings litigation, and flooding litigation. Counsel has and will continue to devote the appropriate resources necessary to prosecute these claims.

38. The elements of Rule 42(b)(1) are met since the prosecution of separate actions by or against individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class. Individualized litigation would present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.

39.     The elements of Rule 42(b)(2) are met since the State has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final declaratory relief regarding the State's liability with respect to the Class as a whole.

40.     The elements of Rule 42(b)(3) are met since maintaining a class action with regard to the issue of the State's liability to Class Members would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Certification is not sought on the question of damages due the Class. Absent Class treatment, courts would be flooded by takings claims from hundreds of plaintiffs. Class-wide determination of the State's liability will avoid duplication and enable faster processing of the multitude of claims since questions of law or fact common to Class Members as to the State's liability predominate over any questions concerning liability which affect only individual member. Moreover, prosecution of the liability question as a class action is superior to other available methods for fairly and efficiently adjudicating a multitude of individual claims.

## CAUSES OF ACTION

**COUNT 1:**      **Violation of Article I, Section 17 of the Texas Constitution for the Taking, Damaging, or Destruction of their Property.**

41.     Individual Plaintiffs re-allege and incorporate the preceding paragraphs of this Petition.

42.     To establish a claim under Article I, Section 17, a property owner must show that there has been: (1) an intentional government act by a government entity; (2) that resulted in the taking, damaging, or destroying of a property owner's property; and (3) for public use. Individual Plaintiffs' and Class Plaintiffs' claims fulfill each of these requirements.

A.    **The Design, Construction, Operation, and/or Maintenance of IH-10 Constitutes a Public Use.**

43.    The design, construction, operation, and/or maintenance by the State of Texas of IH-10 constitutes a "public use" for purposes of Plaintiffs' inverse condemnation claims.

44.    The State of Texas has recognized that public highway projects to facilitate interstate travel fall within the meaning of "public use." Therefore, Individual Plaintiffs and Class Plaintiffs, who are owners of property protected by the Texas Constitution, may bring a claim for just or adequate compensation for their property which has been taken, damaged, and/or destroyed  by the design, construction, operation, and/or maintenance of IH-10.

B.    **The Design, Construction, Operation, and/or Maintenance of IH-10 Caused the Flooding of Plaintiffs' Properties.**

45.    The Texas Supreme Court has recognized that compensation for the taking, damaging or destruction of private property is in order if an injury results from either the construction of public works or their subsequent maintenance and operation. The erection of IH-10, and its subsequent operation and maintenance, by the State that caused the flooding of Individual Plaintiffs' and Class Plaintiffs' property is an invasion for which compensation is required.

C.    **The State Intentionally Caused Damage to Plaintiffs' Properties.**

46.    Finally as to Individual Plaintiffs' and Class Plaintiff's claim under Article I, Section 17 of the Texas Constitution, the element of intent is shown where the governmental entity that physically damages private property to confer a public benefit (1) knows that a specific act is causing identifiable harm; or (2) knows that the specific property damage is substantially certain to result from an authorized government action—that is, that the damage is necessarily an incident to, or necessarily a consequential result of, the government's action. Both of those standards are met here. As noted previously, the State knew that the work it undertook on IH-10, including installation of a solid concrete traffic median barrier/dam it erected down the middle of IH-10, would block the

overtopping of rainfall runoff trying to cross over the roadway as it moved south to the Gulf of Mexico. The State was told that design and construction highway improvements would exacerbate local drainage and flooding concerns, yet it ignored those issues and purposefully altered the drainage plans prepared by its contractors and agents to decrease the drainage under the highway in favor of retaining and storing the water north of IH-10, thereby knowingly and intentionally choosing to inundate those properties north of the highway to protect properties south of IH-10 from flooding.

> 1.    **The State had actual knowledge that its actions caused damage to Individual Plaintiffs' and Class Plaintiffs properties, and that the maintenance and operation of its public improvements would do so again.**

47.    The State was aware at the time it designed, constructed, operated, and/or maintained the IH-10 projects that its actions would cause physical damage to Individual Plaintiffs' and Class Plaintiffs' private property. As the Texas Supreme Court has noted, "There may well be times when a government entity is aware that its action will necessarily cause physical damage to certain private property, and yet determines that the benefit outweighs the harm caused to that property. In such a situation, the property may be damaged for public use." That is precisely what occurred during both Tropical Storms Harvey and Imelda. Individual Plaintiffs' and Class Plaintiffs' properties experienced greater flooding, and for a greater period of time, than ever before because of the backwater effect from the IH-10 projects—as the State knew would happen.

48.    Prior to August 2017, some of Individual Plaintiffs' and Class Plaintiffs' properties suffered short-lived, intermittent flooding from heavy rainfall events, but the storm runoff was able to (and did) naturally flow south over IH-10 and ultimately down to the Gulf of Mexico. Prior to Harvey the State was told that its proposed construction regarding IH-10 would cause drainage issues and flooding of properties north (upstream) of the highway. And in fact during Tropical Storm Harvey, Individual Plaintiffs and Class Plaintiffs experienced significantly greater flooding of (and damage to) their properties, and the inundation lasted for a greater period of time—well after Harvey

Case 1:21-cv-00154-MJT    Document 4    Filed 04/07/21    Page 19 of 34 PageID #:  311

had moved on—than ever before because the rainfall runoff was retained behind the elevated and improved IH-10.

49.     Recognizing the impact of the *de facto* dam formed by the elevated highway with its impermeable traffic median barrier, affected citizens contacted State officials (including officials at TxDOT) and <u>told</u> them of the damage caused to their properties by the State's actions. But the State did nothing to alleviate the problem. Indeed, the State <u>continued</u> its ongoing modifications to IH-10, extending even further the impenetrable barrier down the center of the highway <u>despite</u> having been alerted to the damage caused by the inundation of properties by the rainfall runoff it retained. The State ignored those issues and purposefully altered the drainage plans prepared by its contractors and agents to decrease the drainage under the highway in favor of retaining and storing the water north of IH-10, thereby knowingly and intentionally choosing to inundate those properties north of the highway to protect properties south of IH-10 from flooding. It was only a matter of time before the State's action submerged Individual Plaintiffs' and Class Plaintiffs' properties again.

50.     And that time soon came. In September 2019, Tropical Storm Imelda hit southeast Texas, and again the State's traffic barrier arrested the rainfall runoff. Even though the State had been previously told of the damage caused during Harvey by the weir it had erected in the middle of IH-10, the State continued its operation and maintenance of the highway and persisted with the erection of the impermeable barrier as well.

51.     As Imelda approached, one Chambers County resident – Steven Devillier – sought to prevent a repeat of the devastation wreaked by Harvey. Devillier asked government officials for permission to remove some of the barrier, but when his request was relayed to TxDOT, it was denied. As the Beaumont Enterprise related the story:

> "[Steven] Devillier lives near Winnie in Chambers County, on the north side of Interstate 10. When Hurricane Harvey struck the region in 2017, a solid concrete barrier that divides the freeway's eastbound and westbound lanes had acted like a dam, holding back water headed toward the Gulf of Mexico.

**PLAINTIFFS' SECOND AMENDED PETITION AND REQUEST FOR DISCLOSURES          PAGE 19**

…

Since Harvey, Devillier says, he had been trying to get something done about the freeway partition. Could the divider be redesigned to allow water to flow through? Could drainage underneath be improved?

The barrier seemed to hold back water to the north, swamping the freeway lanes headed toward Houston. The build-up, he believes, caused his and other homes to be inundated, family members included. The freeway was closed for three days.

Devillier says he and his cousin petitioned authorities for change that didn't come fast enough.

As Imelda bore down, Devillier begged the Chambers County judge for permission to demolish the barrier with a trackhoe, he said. The county engineer said officials passed the request to the Texas Department of Transportation, believing it was not the county's decision to make.

TxDOT, according to a spokesperson, had been working with University of Texas researchers to study how the barrier affected flood-prone areas. The agency wasn't ready to see the barricade immediately taken down.

The barrier kept the eastbound lanes of the freeway open, spokesperson Sarah Dupre wrote in an email, allowing authorities to reach an otherwise sealed-off Winnie.

52.    Thereafter, thousands of acres north of the IH-10 barrier, including the Operative Geographic Area, was flooded by rainfall runoff from Imelda retained by the State's Projects.

53.    Because of the benefits to the general public, including protection of property owners south of the highway and the enhanced safety and the creation of an evacuation route via the eastbound lanes of the freeway, the State chose to construct and maintain the operation of IH-10 with the barrier. That intentional choice by the State has forced Individual Plaintiffs and Class Plaintiffs to bear the burden of providing those public benefits, and they are entitled to compensation for their losses.

### 2.    The State possessed knowledge that damage to Plaintiffs' properties was substantially certain to result from its actions.

54.    Because the State actions that form the basis of Individual Plaintiffs' and Class Plaintiffs' claims were public works performed pursuant to Federal Aid Projects, compliance with the federal and state rules and regulations applicable to that work was mandatory. The analyses, studies, and documentation required by those rules and regulations provide objective evidence that the State

knew harm to Individual Plaintiffs' and Class Plaintiffs' properties was substantially certain to result from its actions.

55.    Compliance with 23 C.F.R. 650, Subpart A is required when a proposed project includes a new or expanded encroachment on a floodplain regulated by FEMA. FIRM panel 4803850355E (revised August 6, 2002), and FIRM panels 48071C0275E and 48071C0300E (both effective May 4, 2015), each show that a portion of Federal Aid Project NH 1602(470) crosses a FEMA Special Flood Hazard Area, and the traffic median barriers the State added to IH-10 constitute floodplain encroachments under the terms of the National Flood Insurance Program.

56.    Subpart A required TxDOT to prepare location hydraulic studies for each of the projects that would include a discussion of (a) the hydraulic risks associated with implementation of the action, (b) the impacts from the action on natural and beneficial floodplain values, (c) the support of probable incompatible floodplain development, (d) the measures to minimize floodplain impacts associated with the action, and (e) the measures to restore and preserve the natural and beneficial floodplain values impacted by the action, along with an evaluation and discussion of the practicability of alternatives to any longitudinal encroachments. TxDOT's understanding of and need for compliance with these regulations created objective evidence of the State's knowledge of the damage to Individual Plaintiffs' and Class Plaintiffs' properties that would occur from its actions regarding IH-10.

57.    Similarly Presidential Executive Order 11988 requires each actor, in carrying out federal programs, (1) to reduce the risk of flood loss, to minimize the impact of floods on human safety, health and welfare, and to restore and preserve the natural and beneficial values served by floodplains; and (2) to evaluate the potential effects of any actions in a floodplain to ensure its planning programs reflect consideration of flood hazards and floodplain management and to consider alternatives that will not impact a floodplain. Additional federal regulations required the State to

implement Federal Aid Projects in a manner (a) to prevent uneconomic, hazardous, or incompatible use and development of floodplains; (b) to avoid, where practicable, encroachments by its actions; (c) to minimize the adverse impacts its actions may have on base floodplains, including direct or indirect support for development; and (d) to preserve the natural and beneficial floodplain values that are adversely affected by such actions.

58.    Finally, Texas state statutes and regulations, including TxDOT's own rules and policies, require an investigation, analysis, and documentation that provide objective evidence of the State's knowledge of the expected flooding of Individual Plaintiffs' and Class Plaintiffs' properties created by the State's actions. The standards and criteria presented in the TxDOT Hydraulic Design Manual are the minimum standards and criteria acceptable for projects involving new drainage structures or replacement of existing structures (as TxDOT's work on IH-10 did), which means that all drainage facilities were required to have been designed for existing land use conditions and should have included capacity to convey stormwater runoff from all existing adjacent properties for the design year storm so that the projects would not induce flooding or cause any adverse flooding impact on upstream facilities.

59.    To that end, during the projects' design work the State was required to study the natural and established patterns of drainage – including that beyond the vicinity of each proposed project – to minimize or avoid damage to adjacent property. This investigation included the examination of the established patterns of drainage so that the project's drainage design would include capacity to convey stormwater runoff from all existing adjacent properties based on existing land use conditions at the time of the design. Hydrologic analyses were necessary for each project, and all sources of potential risk must have been considered as part of the investigation for the projects' hydraulic structures – including the consequences associated with the probability of flooding, property

loss, and/or hazard to life during the service life of the project – to determine whether modified site-specific standards or criteria would be appropriate for the project.

60.     At the time of design, all drainage facilities must be designed for existing land use conditions and so that any project does not cause an adverse flooding impact on facilities existing upstream of the project. TxDOT hydraulic engineers must review the potential liabilities stemming from the impact of any highway project on a floodplain. This includes instances where, as here, the rehabilitation or maintenance of a roadway results in a higher profile, such as the case presented here. TxDOT engineers must evaluate the impact of its work to ensure consistency with the federal requirements regarding the impact of a highway on a floodplain.

61.     In the course of its work, the State (presumably, as required by applicable regulations) studied the antecedent conditions and basic hydrologic data surrounding the project and determined and prepared an event-based model for the project's design flood. likewise, the state determined the direct runoff, the peak stage, the peak flow, the flood peak, the effective precipitation, the annual exceedance probability, the overland flow, the direct excess, the surface runoff, and the design runoff for the design flood as well as for the design storm.

62.     Because of this hydrologic investigation, TxDOT determined the elevations that make up the flood profile and knew that the traffic median barrier would retain direct runoff. The State knew the highest point of elevation in the Operative Geographic Area and it knew that stormwater runoff throughout the Operative Geographic Area flowed from north to south when it raised the grade level of IH-10 and installed a dam down its centerline.

63.     The State also knew that its work affected the base flood elevation within the Operative Geographic Area. In fact, the concrete traffic barrier installed by the State reaches a height greater than twelve inches (12") above the base flood elevation within the Operative Geographic Area, and resulted in the top of the grade line of IH-10 rising to a msl level twelve inches (12") above the

base flood elevation within the Operative Geographic Area as well. When the State constructed its projects, it had possession of or access to information from which it could have determined that the traffic median barrier installed as one part of that project would retain direct runoff that would cause damage to a portion of the Operative Geographic Area.

64.     Indeed, after Harvey (and prior to Imelda), TxDOT employees were told that the traffic median barrier previously installed in the center of IH-10 had resulted in the flooding of private property. The State had actual knowledge of the flooding its latest project would cause before it raised the grade level of IH-10 and installed a dam down its centerline prior to Imelda.

> **3.     Subjective knowledge by the State that its action will cause specific harm to a specific piece of property should not be required to recover on a Takings claim under the Texas Constitution.**

65.     As shown below in Count 2, the intent or knowledge requirement to demonstrate a taking under the Texas Constitution differs from the showing a party needs to make to recover under the Fifth Amendment to the U.S. Constitution. Given the recent change in Takings jurisprudence by the U.S. Supreme Court, any difference should be eliminated.

66.     The rights and protection accorded Texas property owners under the State constitution's Takings provision should not provide less security against having their property taken without just compensation than its federal counterpart.

67.     The ability of a property owner to litigate both a Fifth Amendment Takings claim and a claim under Article I, Section 17 of the Texas Constitution in the same suit should bring the intent standard applicable to each in harmony so that an unnecessary and perfidious dichotomy between the state and federal claims is eliminated.

68.     The State's reckless and/or willful disregard of facts should support a finding of the requisite intent for a Takings claim involving the flooding of private property. Government actors should be treated the same as other litigants vis-à-vis how the element of "intent" is applied under

Texas law when that element is adjudicated in an action to which they only are subject—a Takings claim. Therefore, Plaintiffs bring their nonfrivolous argument for the extension, modification, or reversal of existing Texas law, and seek recovery of just and adequate compensation pursuant to Article I, Section 17 of the Texas Constitution for the permanent and/or temporary taking, damaging, and/or destruction of their real and personal property.

**COUNT 2:** **The Taking of Property Without Just Compensation in Violation of the Fifth Amendment to the United States Constitution.**

69.     Individual Plaintiffs and Class Plaintiffs re-allege and incorporate the preceding paragraphs of this Petition.

70.     In addition to, and in the alternative to, their claim under the Texas Constitution, Individual Plaintiffs and Class Plaintiffs seek recovery for the State's permanent and/or temporary taking of their real and personal property without paying just compensation in violation of the Takings Clause of the Fifth Amendment of the U.S. Constitution, a self-executing constitutional provision made applicable to the State through (and herein plead pursuant to) the Fourteenth Amendment of the U.S. Constitution.

71.     Federal Takings law directs that whether government-induced increased water runoff onto private property constitutes inverse condemnation under the Fifth Amendment is determined by a two-question test: (1) did the Individual Plaintiffs and Class Plaintiffs possess a protectable property interest in what they allege the government has taken and (2) were the effects the Individual Plaintiffs' and Class Plaintiffs experienced the predictable result of governmental action which was sufficiently substantial to justify a Takings remedy. Here the answer to both those questions is yes.

72.     All Individual Plaintiffs and Class Plaintiffs suffered flooding of their property greater than ever before after TxDOT built the barriers/dams along the elevated IH-10.

73. The State should not force Individual Plaintiffs and Class Plaintiffs alone to bear the burdens of providing increased highway safety and an emergency evacuation route which, in all fairness and justice, should be borne by the public as a whole.

**A.    All Individual Plaintiffs and Class Plaintiffs Possess a Protectable Interest in Their Property.**

74. The existence of a protectable property interest under the Fifth Amendment is a question of federal law determined with reference to state law. Texas law recognizes that the term property, as it applies to Takings law, means not only the thing owned, but also every right which accompanies ownership. Each Plaintiff has property rights in both real and personal property protected by the Fifth Amendment which have been taken by the State's actions.

**B.    The Effects Individual Plaintiffs and Class Plaintiff Experienced Were the Predictable Result of the State's Action and Were Sufficiently Substantial to Justify a Takings Remedy.**

75. The physical possession of Plaintiffs' property, both real and personal, constitutes a *per se* taking of that property by the State.

76. Independently, an analysis of six factors shows that not only was the flooding Individual Plaintiffs and Class Plaintiffs experienced the predictable result of the State's action, but also the effects suffered were sufficiently substantial to constitute a taking.

**1.    The time and duration of the invasion.**

77. Because Individual Plaintiffs' and Class Plaintiffs' properties were physically invaded by the flooding from the State's actions (whether temporarily or permanently), the temporal element of the federal analysis is used only to determine the measure of just compensation under the Fifth Amendment, not whether a claim arose at all. This element supports the finding of a taking.

**2.    The severity of the interference.**

78. Individual Plaintiffs and Class Plaintiffs meet the severity burden since their real and personal property interests have been subjected to an invasion that destroyed and/or completely

precluded Individual Plaintiffs' and Class Plaintiffs' access to, right to use, and enjoyment of their property. This element supports the finding of a taking.

> ### 3.    Individual Plaintiffs' and Class Plaintiffs' properties were flooded by the State's actions.

79.    The invasion of Individual Plaintiffs' and Class Plaintiffs' properties was caused by the State's action as shown by a comparison of the results from government-authorized actions for a public purpose with what the result would have been without or "but for" those government-authorized actions. Individual Plaintiffs' and Class Plaintiffs' properties are located behind a permanent structure that blocks and backs up rainfall runoff at a level that floods those properties. The inundation of Individual Plaintiffs' and Class Plaintiffs' properties was the direct, natural, and foreseeable result of authorized activities by the State in furtherance of a public purpose: the design, construction, operation, and maintenance of IH-10. "But for" the State-authorized action, Individual Plaintiffs' and Class Plaintiffs' properties would not have been flooded in the manner and to the extent they were flooded. This factor supports finding a taking.

> ### 4.    The degree to which the invasion was intended.

80.    The intent to find a taking under the Fifth Amendment is shown by evidence that the Individual Plaintiffs' and Class Plaintiffs' injuries were the direct, natural, or probable result of the authorized government action. It is not necessary to show that the State subjectively intended to take any of Individual Plaintiffs' and Class Plaintiff's property, only that the flooding of Individual Plaintiffs' and Class Plaintiffs' land was the natural and probable consequence of the State's acts. Before the State's actions, rainfall runoff from large storm events overtopped IH-10 and proceeded south to the Gulf. But, after the State raised the highway elevation and built a solid barrier/dam constructed across the median of the roadway, those structures retained stormwater runoff and held it on Individual Plaintiffs' and Class Plaintiffs' property—an obvious result of the State's actions. Because an analysis by the State of the hydrological impact caused by the placement of such a dam in

the center of IH-10 would have confirmed the eventual flooding that invaded and appropriated Individual Plaintiffs' and Class Plaintiffs' property, this factor supports finding a taking.

### 5.    The character of the land at issue.

81.    Individual Plaintiffs' and Class Plaintiffs' properties are homes, farms, ranches, and businesses whose use is grossly inconsistent with—and exceptionally vulnerable to—significant damage from flooding of the kind and severity experienced because of TxDOT's IH-10 projects. The character of the land, as reflected in its use by Individual Plaintiffs' and Class Plaintiffs, supports finding a taking.

### 6.    Individual Plaintiffs' and Class Plaintiffs' reasonable investment-backed expectations.

82.    Finally, the State's actions ran counter to, and severely interfered with, Individual Plaintiffs' and Class Plaintiffs' reasonable investment-backed expectations in the safety and security of the residential and commercial properties that they rented or owned, as well as the use and enjoyment of their personal property destroyed by the subject flooding.

83.    When Individual Plaintiffs and Class Plaintiffs acquired their property interests, they did not expect that a new hydrologic landscape would be created by the State implementing a de facto flood control effort that did not exist, or was not evident, when they purchased or leased their real properties. Most of Individual Plaintiffs' and Class Plaintiffs have invested their life savings into their properties without any expectation of the flood certainty that the State has created. The State-created flooding has severely impacted the economically viable and productive use of the land, decimating Plaintiffs' reasonable investment-backed expectations. This factor too supports finding a taking.

C.    **The State's Physical Invasion of Individual Plaintiffs' and Class Plaintiffs' Property, Depriving Them of the Use, Enjoyment, Exclusive Possession, and Right to Alienate their Property, Independently Constitutes a Taking Under the Fifth Amendment.**

84.    Generally, the government can take property by two means: physically or by regulation. Both types of Takings can be further divided into two categories: categorical and non-categorical. Categorical Takings deprive the owners of all economically viable use of their property. Non-categorical Takings, on the other hand, deprive the owner of some amount of the economic use of the property (either through physical invasion or onerous regulation). Furthermore, a taking can be either permanent or temporary in duration.

85.    Individual Plaintiffs' and Class Plaintiffs' properties were physically invaded by stormwater runoff the State stored on their land, in their homes, and/or in their businesses. The inundation itself lasted for a several days, and that was followed by a long period of cleanup, replacement, and repair after both Harvey and Imelda. Indeed, some properties were not completely repaired after Harvey when Imelda struck, and some remain unfinished to this day.

86.    The State-caused flooding effected (1) a temporary categorical physical taking of their real property; (2) a permanent non-categorical physical taking of a flowage easement over their real property, and (3) a permanent categorical physical taking of their personal property. Individual Plaintiffs and Class Plaintiffs seek just compensation for the taking of their property without just compensation.

**COUNT 3:    Deprivation of Property Interests Without Procedural Due Process in Violation of the Fourteenth Amendment to the United States Constitution.**

87.    Individual Plaintiffs and Class Plaintiffs re-allege and incorporate the preceding paragraphs of this Petition.

88.    In the alternative, should their claim under the Takings Clause of the Fifth Amendment be found unavailable or inapplicable for any reason, the State's actions violated

Individual Plaintiffs' and Class Plaintiffs' procedural due process rights under the Fifth and Fourteenth Amendments of the U.S. Constitution by transgressing the rights, privileges, and/or immunities secured by the U.S. Constitution, including but not limited to depriving Individual Plaintiffs and Class Plaintiffs of a property interest without due process of law.

89.    As interpreted by Texas courts, the intent or knowledge requirement necessary to demonstrate a taking under the Texas Constitution differs from the showing a party needs to make to recover under the Fifth Amendment to the U.S. Constitution. The rights and protection accorded Texas property owners under the State constitution's Takings provision should <u>not</u> provide less security against having their property taken without just compensation than its federal counterpart. The ability of a property owner to litigate both a Fifth Amendment Takings claim and a claim under Article I, Section 17 of the Texas Constitution in the same state court action should bring the intent standard applicable to each in harmony so that (a) an unnecessary and perfidious dichotomy between the state and federal claims is eliminated and (b) the long-recognized policies behind the guarantee of compensation embodied by Takings provisions are effected. The State's reckless disregard (and/or intentional avoidance) of knowledge and facts which it had a duty to investigate should support a finding of the requisite intent for a Takings claim under Article 1, Section 17 of the Texas Constitution.

90.    Individual Plaintiffs and Class Plaintiffs do not have the opportunity to have their inverse condemnation claims as provided for by the Texas Constitution heard in a meaningful manner because the process provided under Texas law is not constitutionally adequate given the intent requirement applied to such claims.

91.    The failure of the State to institute a pre-deprivation process or procedure was the proximate cause of the damage to Individual Plaintiffs' and Class Plaintiffs' property and liberty interests suffered by Individual Plaintiffs' and Class Plaintiffs.

**PLAINTIFFS' SECOND AMENDED PETITION AND REQUEST FOR DISCLOSURES        PAGE 30**

**COUNT 4:**   **Deprivation of Property Interests Without Substantive Due Process in Violation of the Fourteenth Amendment to the United States Constitution.**

92.     Individual Plaintiffs and Class Plaintiffs re-allege and incorporate the preceding paragraphs of this Petition.

93.     In the alternative, should their claim under the Takings Clause of the Fifth Amendment be found unavailable or inapplicable for any reason, the State's actions violated Individual Plaintiffs' and Class Plaintiffs' substantive due process rights under the Fifth and Fourteenth Amendments of the U.S. Constitution. The State's exercise of control over and destruction of Individual Plaintiffs' and Class Plaintiffs' property implicate Individual Plaintiffs' and Class Plaintiffs' constitutionally protected rights in that real and personal property. The State's taking, damaging, and/or destruction of Individual Plaintiffs' and Class Plaintiffs' property rights supports the filing of an inverse condemnation claim by Individual Plaintiffs and Class Plaintiffs under the Texas Constitution. However, the intent or knowledge requirement necessary to successfully prosecute a taking an inverse condemnation claim under the Texas Constitution is not rationally related to a legitimate governmental interest, especially when weighed against the rights and protection accorded Texas property owners under Article I, Section 17 of the Texas Constitution.

94.     The substantive principles applied to inverse condemnation claims under the Fifth Amendment to the U.S. Constitution should serve as the constitutional minimum required of the State of Texas when assessing whether adequate compensation is due Texas property owners when their property is taken, damaged, or destroyed by the State for a public purpose.

95.     But the legal principles applied to inverse condemnation claims under the Texas Constitution violate Individual Plaintiffs' and Class Plaintiffs' property and liberty interests protected by the substantive due process jurisprudence of the Fifth and Fourteenth Amendments to the U.S. Constitution.

**COUNT 5:**    **Request for Declaratory and Injunctive Relief.**

96.    Individual Plaintiffs and Class Plaintiffs re-allege and incorporate the preceding paragraphs of this Petition.

97.    In addition, pursuant to Texas Civil Practice and Remedies Code Chapter 37, the Uniform Declaratory Judgments Act, the Individual Plaintiffs and Class Plaintiffs seek a judgment declaring (a) that the State of Texas is liable to them for the taking, damaging, and/or destruction of Individual Plaintiffs' and Class Plaintiffs' property rights without adequate compensation as required by Article I, Section 17 of the Texas Constitution, and/or the Fifth and Fourteenth Amendments to the U.S. Constitution, and (b) that the State's actions violated the due process protections guaranteed by the Fourteenth Amendment to the U.S. Constitution.

98.    In support, the Individual Plaintiffs and Class Plaintiffs plead that they seek relief from uncertainty and insecurity with respect to rights, status, and other legal relations in their real property as against the defendant State in that their rights, status, or other legal relations in their title to property are affected by the State's action. The Individual Plaintiffs and Class Plaintiffs seek a declaration of the constitutionality of the disputed State actions, including a declaration that Individual Plaintiffs' and Class Plaintiffs' property rights were their taken, damaged, and/or destroyed without adequate compensation under Article I, Section 17 of the Texas Constitution and/or the Fifth and Fourteenth Amendments to the U.S. Constitution.

99.    And pursuant to Tex. Civ. Prac. & Rem. Code § 37.011, Individual Plaintiffs and Class Plaintiffs likewise request further and supplemental relief (including but not limited to injunctive relief as set forth in Tex. Civ. Prac. & Rem. Code ch. 65) in connection with their declaratory judgment action. Individual Plaintiffs and Class Plaintiffs seek prospective relief requiring the State to remedy its taking, damaging, and/or destruction of Individual Plaintiffs' and Class Plaintiffs' property rights without adequate compensation as required by Article I, Section 17 of the Texas Constitution, and/or

the Fifth and Fourteenth Amendments to the U.S. Constitution by instituting the process set forth in Chapter 21 of the Texas Civil Practice & Remedies Code to formally condemn those property interests previously taken, damaged, and/or destroyed without adequate compensation.

## PRAYER

Individual Plaintiffs and Class Plaintiffs pray that the Court enter judgment in Individual Plaintiffs' and Class Plaintiffs' favor finding that Individual Plaintiffs and Class Plaintiffs are entitled to recover based on the allegations and claims above in an amount to be determined by the trier of fact, and awarding Individual Plaintiffs and Class Plaintiffs all other relief sought herein that this Court is empowered to provide and to which Individual Plaintiffs and Class Plaintiffs show themselves entitled.

Dated: March 17, 2021

Respectfully submitted,

*/s/ E. Lawrence Vincent*

Daniel H. Charest
SBN: 24057803
E. Lawrence (Larry) Vincent
SBN: 20585590
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, Texas 75202
(469) 904-4550
(469) 444-5002 (fax)
dcharest@burnscharest.com
lvincent@burnscharest.com

Charles Irvine
SBN: 24055716
Mary Conner
SBN: 24050440
**IRVINE & CONNER, PLLC**
4709 Austin Street
Houston, Texas 77004
(713) 533-1704
(713) 524-5165 (fax)
charles@irvineconner.com
mary@irvineconner.com

Lawrence G. Dunbar
SBN: 06209450
**DUNBAR HARDER, PLLC**
10590 West Office Drive, Suite 2000
Houston, Texas 77042
(713) 782-4646
(713) 782-5544 (fax)
ldunbar@dunbarharder.com

*Counsel for Plaintiffs*